## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD S. HOUSTON,** | : | **CIVIL ACTION NO. 1:12-CV-2148** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **vs.** | : | |
| | : | |
| **CAROLYN W. COLVIN, ACTING** | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SOCIAL SECURITY,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

## Background

The above-captioned action seeks review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Richard S. Houston's claim for social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Houston met the insured status requirements of the Social Security Act through September 30, 2008. Tr. 22, 24, 148 and 153.[1] In order to establish entitlement to disability insurance benefits Houston was required to establish that he suffered

---

[1]References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Answer on December 20, 2012.

from a disability on or before September 30, 2008.  42 U.S.C. §423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Houston protectively filed[2] his application for disability insurance benefits on August 18, 2009, almost eleven months after the date last insured. Tr. 22, 112-113, 116, 119 and 122.  In the application Houston alleged that he became disabled on February 14, 2007. Tr. 112.  On December 22, 2009, the Bureau of Disability Determination[3] denied Houston's application.   Tr. 94-96.  On January 25, 2010, Houston filed a request for reconsideration which was denied on March 3, 2010.  On March 23, 2010, Houston filed a request for a hearing before an administrative law judge. Tr. 22 and 97-102.  The request was granted and a hearing was held on February 10, 2011. Tr. 22 and 44-89.  Houston was represented by counsel at the hearing. Id.  On May 10, 2011, the administrative law judge issued a decision denying Houston's application. Tr. 22-30.  As will be explained in more detail *infra* the administrative law judge found that Houston failed to prove that he met the requirements of a listed impairment or suffered from  work-preclusive functional limitations on or before the date last insured. Tr. 25-30.  On July 12, 2011, Houston filed a request for review with the Appeals Council and after over 13 months had

---

[2]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[3]The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.  Tr. 94.

elapsed the Appeals Council on August 29, 2012, concluded that there was no basis upon which to grant Houston's request for review. Tr. 1-5 and 15-16. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.[4] Houston then filed a complaint in this court on October 27, 2012.  Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on May 8, 2013, when Houston  filed a reply brief.

Houston was born in the United States on May 1, 1977, and at all times relevant to this matter was considered a "younger individual"[6] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. § 404.1563(c). Tr.  90, 112, 114, 119, 122 and 153.  In documents filed with the Social Security Administration, Houston stated that the highest grade he completed was the 10th grade in 1993 and that during his primary and secondary schooling he did not attend special education classes. Tr. 161.  Houston did not obtain a General

---

[4]Houston also filed on August 25, 2009, an application for supplemental security income (SSI) benefits but that application was denied because of excess financial resources. Tr. 22 and 148. The denial of the SSI application is not an issue in the present appeal.  Houston, additionally, was incarcerated for unpaid tickets and possession of marijuana from October 13, 2008 to March 30, 2009, and accordingly, would have been ineligible for SSI benefits during that time. Tr. 22 and 58-59.

[5]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

[6]The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

Equivalency Diploma or complete "any type of special job training, trade or vocational school." <u>Id.</u>  Houston also reported that he could read, write, speak and understand the English language and perform basic mathematical functions such as counting change, handling a savings account and using a checkbook and money orders. Tr. 156 and 165.

Despite these written representations, Houston testified at the administrative hearing that:  he did not finish the 9th grade and his mother pulled him out of school at the age of 16; he repeated kindergarten; he had a learning disability; and, he could not read or spell "anything."[7]  Tr. 60 and 70.  Houston stated that he had a 6th grade reading level but then equivocated, stating:  "I don't even know if it is that." Tr. 86.  Education records confirm that during the 9th grade Houston was classified as learning disabled by the Miller Place Union Free School District, Miller Place, New York, and that he had an Individualized Education Plan. Tr. 437.  A Metropolitan Achievement Test administered during the 7th grade revealed that Houston had an instructional reading level of grade 4 or lower and instructional mathematics level of grade 7-8. Tr. 435. The administrative law judge concluded that Houston had a limited education but was not illiterate. Tr. 27 and 29.

Houston has a limited work and earnings history. Tr. 150. His employment history consists primarily of work as a masonry laborer and an automobile detailer

---

[7]The record reveals that Houston completed several forms in neat and legible handwriting. <u>See</u>, <u>e.g.</u>, a document entitled "Function Report - Adult." Tr. 163-170. The "Function Report - Adult" which was completed on October 8, 2008, by Houston reveals no spelling errors. <u>Id.</u>

4

and repairer. Tr. 76-80 and 158. A vocational expert identified the automobile detailer and repairer positions as Houston's past relevant employment.[8] Tr. 79-80. The vocation expert described the automobile detailer position as unskilled, medium work, and the automobile repairer position as skilled, heavy work.[9] Id.

---

[8]Past relevant employment in the present case means work performed by Houston during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant work, the work must also amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

[9]The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as  loss of fine dexterity or inability to sit for long  periods of time.

> (c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

The records of the Social Security Administration reveal that Houston had earnings in the years 1991 through 1992, 1994 through 1999, and 2002 through early 2007. Tr. 150.  Houston's annual earnings range from a low of $266.76 in 1995 to a high of $13,563.82 in 1999. Id.   The sum of Houston's  earnings during those 14 years is $46,833.27. Id.  Houston testified that he stopped working full-time on February 14, 2007. Tr. 54 and 157.  He further testified that on or about that date (which he asserts is the disability onset date) that he "was doing block work in St. Augustine [, Florida]." Tr. 54-55. Houston claims he stopped working "because of [his] condition." Tr. 157.

Houston claims that he is unable to work because of injuries he sustained on or about February 13, 2007, as well as subsequent injuries sustained in September, 2008.[10] Tr. 224-225 and 337-338.  The circumstances surrounding his initial injuries are unclear.  Houston had consumed several controlled substances, and abrasions were observed on his body. Tr. 337-338.  According to subsequent treatment

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

2 C.F.R. § 404.1567.

[10]In September, 2008, Houston was 31 years old and he is presently 35.

6

records, Houston apparently reported that "[h]e had multiple trauma from an assault that he cannot remember [because he] pass[ed] out after taking oxycontin and drinking alcohol." Tr. 449.  The evening of February 13, 2007, Houston was admitted to the Shands Healthcare, Alachua General Hospital, Gainsville, Florida, in a comatose state. Id. Over the next several months Houston had two lengthy hospitalizations. Tr. 256-257, 297-298 and 446-452.  However, after May, 2007, there is an absence of medical documentation until September 2, 2008. Tr. 224-226.  On or about that date Houston was riding a bicycle and apparently fell and during that fall one of the bicycle pedals struck his right knee cap fracturing it. Id.

Houston reported that he has no problems with personal care, such as dressing, bathing, shaving and feeding himself; he needs no special reminders to take care of personal needs and grooming or help taking or reminders to take medicines or reminders to go places; he engages in minor household repairs and does laundry; he goes outside at least once per day; he shops in stores for groceries two times per month about 30 to 45 minutes; he watches TV "very often & very well;" he visits and talks with other people everyday; he admitted he had no problems with reaching, talking, hearing, seeing, his memory, following instructions, using his hand and getting along with others. Tr. 164-168.

Houston testified at the administrative hearing that he is physically able to drive a motor vehicle but that he lost his driver's license as a consequence of unpaid tickets and a conviction for possession of marijuana. Tr. 58.  Houston was able to walk to the administrative hearing one block from where his girlfriend dropped him

7

off. Tr. 62. Houston is also able to take public transportation on his own. Tr. 62 and 166.  Houston has two children, and he has custody of his 11-year old son during the summertime. Tr. 63.  Houston testified that he can lift about 10 to 15 pounds, noting that he had lifted his suitcase in the past month. Tr. 65. Houston had previously reported that he could lift up to 30 pounds. Tr. 168.  He further testified that he could stand and/or walk for about 20 minutes at a time; he is able to grill steaks and occasionally wash dishes; he goes fishing with his son during the summer; and he plays video games on a Nintendo Wii gaming system with his son, though he stated that he does not play the more physically active games. Tr. 64-65. Houston stated that he could perform 75% of physical activities despite his leg impairments. Tr. 67. Houston reported that he can climb stairs by using the handrail, though he has difficulty with them, and with walking for any length of time. Tr. 168. He also reported that he can walk one-eighth of a mile at a time without resting (with a cane), sit for 2 hours at a time, and stand for 10 minutes at a time. Id.

The record reveals that Houston has a significant history of substance abuse, involving alcohol, marijuana, cocaine and opiates. Tr. 71, 265,  291, 318, 398 and 400. At the administrative hearing, Houston testified that the last time he used cocaine, marijuana or any kind of illegal drugs was "over a year at least," and he specifically admitted that he had used marijuana since his alleged disability onset date of February 14, 2007. Tr. 56. When asked whether he drank alcoholic beverages, he responded "[n]ot often."  He admitted smoking one pack of cigarettes per day. Tr. 62-63.  With respect to abusing alcohol, Houston admitted that he drank an "18

pack of beer" in 2009, which apparently resulted in a trip to the hospital because he could not go to the bathroom. Tr. 71.

Houston claims that he is disabled and unable to work because of left lower extremity compartment syndrome, status post-fasciotomy;[11] a fractured right knee cap (patella); and a learning disability, including functional illiteracy. Doc. 13, Plaintiff's Brief, p. 2. Houston contends that he has "non-stop pain" in his right knee cap and that he walks with a cane "all the time" and that he started using it in 2007. Tr. 26-27. When asked at the hearing what problems he had with his left leg he stated that "[i]t just tingles" and "[i]t feels like it's asleep all the time." Tr. 69.

## I.    <u>Standard of Review</u>

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>,  181 F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858

---

[11]Thick layers of tissue, fascia, separate groups of muscles in the arms and legs from each other forming compartments. The compartments not only contain muscles but also nerves and blood vessels which supply the muscles with nutrients. Compartment syndrome is where there is increased pressure in a compartment causing nerve damage and decreased blood flow.  There are several causes of compartment syndrome including trauma, drug and alcohol abuse and coma. A fasciotomy is a surgical procedure where the fascia are cut open to relieve the pressure. <u>See</u>, <u>generally</u>, Compartment Syndrome, MedlinePlus, U.S. National Library of Medicine, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/001224.htm (Last accessed March 4, 2014); Stephen Wallace, M.D., Compartment Syndrome, Lower Extremity, http://misc.medscape.com/pi/android/medscapeapp/html/A1270542-business.html (Last accessed March 4, 2014).

(3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant
to 42 U.S.C. § 405(g) is to determine whether those findings are supported by
"substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988);
Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are
supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v.
Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are
supported by substantial evidence, we are bound by those findings, even if we
would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700,
704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive
by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71
F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001);
Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

      Substantial evidence "does not mean a large or considerable amount of
evidence, but 'rather such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565
(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));
Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);
Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been
described as more than a mere scintilla of evidence but less than a preponderance.
Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial
evidence may be "something less than the weight of the evidence, and the
possibility of drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## II.   <u>Sequential Evaluation Process</u>

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether

such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[12] (2) has an impairment that is severe or a combination of impairments that is severe,[13] (3)

---

[12] If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

[13] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

has an impairment or combination of impairments that meets or equals the

requirements of a listed impairment,[14] (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy. Id.  As part of step four the administrative law judge

must determine the claimant's residual functional capacity. Id.[15]

Residual functional capacity is the individual's maximum remaining ability to

do sustained work activities in an ordinary work setting on a regular and

continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2,

1996).  A regular and continuing basis contemplates full-time employment and is

defined as eight hours a day, five days per week or other similar schedule.  The

residual functional capacity assessment must include a discussion of the

individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1

("'Residual functional capacity' is defined as that which an individual is still able to

do despite the limitations caused by his or her impairment(s).").

## III.  Medical Records

Before we address the administrative law judge's decision and the arguments

of counsel, we will review in detail Houston's medical records.

---

[14]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

[15]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

It is undisputed that during February through May, 2007, Houston suffered from serious medical conditions and received extensive medical treatment.  During this four month period, Houston underwent two lengthy hospitalizations as well as nursing home care at Park Meadows Health and Rehabilitations Center in Gainsville, as follows: from February 14 to March 21, 2007, and from March 31 to May 22, 2007. Tr. 249-254, 256-259, 295-296 and 446-452.  However, after May 2007, and until September 2, 2008, there is a lack of evidence in the record that Houston received medical care and treatment.

As stated earlier on or about February 13, 2007, Houston was found in a comatose state and transported and admitted to Alachua General Hospital. Tr. 295-296.  At the time of admission it was reported that Houston was found "down and unresponsive for an unknown duration of time" and that the "last known time that he was seen by anyone was approximately three days earlier." Tr. 341.  A physical examination was performed which revealed that Houston had an extremely rapid pulse of 158 and a respiration rate  of 52 but only slightly elevated blood pressure of

135/75. Tr. 342.  Houston's Glasgow Coma scale was 7 representing a state of coma.[16]

Id.  Houston did not respond verbally.  He had a hematoma above the right eye and

facial abrasions which were "foul smelling.".  Id.  His right eye was swollen closed.

Id.  He was edentulous (lacking teeth) and he had a "thick purulent mucoid coating

of his tongue and posterior pharynx." Id. Houston had numerous bruises and

abrasions, including on his chest wall, elbows, shoulder and knees and his "left calf

was swollen and tense." Id.  The attending physician noted that he could not rule

out a deep venous thrombosis (DVT)(blood clot) of the left calf. Id.  Houston had

some evidence of livedo reticularis[17] of the right foot. Id. The attending physician

--------

[16]Glasgow Coma Scale is "a quick, practical standardized system for assessing the degree of consciousness in the critically ill and for predicting the duration and ultimate outcome of coma, primarily in patients with head injuries. The system involves eye opening, verbal response, and motor response, all of which are evaluated independently according to a rank order that indicates the level of consciousness and degree of dysfunction. The degree of consciousness is assessed numerically by the best response. The results may be plotted on a graph to provide a visual representation of the improvement, stability, or deterioration of a patient's level of consciousness, which is crucial to predicting the eventual outcome of coma. The sum of the numeric values for each parameter can also be used as an overall objective measurement, with 15 indicative of no impairment, 3 compatible with brain death, and 7 usually accepted as a state of coma. The test score can also function as an indicator for certain diagnostic tests or treatments, such as the need for a computed tomography scan, intracranial pressure monitoring, and intubation. The scale has a high degree of consistency even when used by staff with varied experience." Mosby's Medical Dictionary, 8th edition. 2009.

[17]"Livedo reticularis is a vascular condition characterized by a purplish discoloration of the skin, usually on the legs. This discoloration is described as lacy or net-like in appearance and may be aggravated by cold exposure.  Most often livedo reticularis causes no symptoms and needs no treatment. But it can be associated with serious underlying disorders[.]" Livedo reticularis: When is it a concern?, MayoClinic, http://www.mayoclinic.org/livedo-reticularis/expert-answers/FAQ-20057864 (Last assessed March 4, 2014).

was unable to perform a sensory examination. Tr. 343.  An EKG revealed sinus tachycardia[18] with poor R-wave progression. Id.  An x-ray of the chest revealed "a right lower lobe infiltrate suggestive of a pneumonia[.]" Tr.338.  A CT scan of the head showed "a hematoma of the right orbit, right frontal bone without fracture." Id.  A urine drug screen was positive for opiates, tricyclic antidepressants and cocaine. Id.  The diagnostic impression was that Houston experienced the following medically significant issues:  multiple facial trauma; a possible drug overdose or a closed head-head injury; acute rhabdomyolysis[19] with low urine output (oliguria) and elevated creatine kinase;[20] pressure necrosis (cell injury or death) of areas of his extremities with evidence of livedo reticularis; right lower lobe pneumonia; acute renal failure; and polysubstance abuse. 343.  Treating physicians later concluded that Houston suffered from left lower extremity compartment syndrome. On

---

[18]Tachycardia is a heart rate that exceed 100 beats per minute.

[19]Rhabdomyolysis is the rapid destruction of skeletal muscle that leads to the release of muscle fiber contents into the blood and can result in renal(kidney) failure. There are several causes of this condition, including the use of cocaine and opiates. See Rhabdomyolysis, MedlinePlust, U.S. National Library of Medicine, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/000473.htm (Last accessed March 4, 2014).

[20]Creatine kinase (also known as creatine phosphokinase) is an enzyme found in brain, heart and skeletal muscle tissue and elevated levels of that enzyme in the blood suggest damage to those tissues. See Creatine phosphokinase test, MedlinePlus, U.S. National Library of Medicine, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/003503.htm (Last accessed March 5, 2014).

February 14, 2007, Houston underwent surgery, a four compartment fasciotomy, to

relieve the pressure in that extremity. Tr. 344-345.

During his initial hospital stay Houston was also evaluated on February 17,

2007, by a neurologist, Jeffrey Borkoski, M.D., who concluded after performing a

clinical interview and physical examination that Houston suffered from

"[e]ncephalopathy, probable mild anoxic encephalopathy,"[21] "[r]habdomyolysis

secondary to acute renal failure requiring hemodialysis," "[l]eft lower extremity

compartment syndrome requiring fasciotomy," and "[p]olysubstance abuse[.]" Tr.

396-397.  Houston also had two ultrasounds performed on the right upper extremity.

Tr. 311.  On February 16, 2007, the ultrasound study was negative for a deep venous

thrombosis. Id.  However, on March 9, 2009, a second ultrasound study revealed a

"[t]hrombus [blood clot] within the right brachial vein."[22] Id.  On March 13, 2007,

Houston was "doing well,"  his "[w]ound was healing [without] complications" and

he was demanding to go home. Tr. 389-390.

Houston was discharged from his first hospitalization on March 21, 2007. Tr.

297.  The discharge diagnosis was as follows: (1) multiple trauma; (2) right

periorbital laceration; (3) rhabdomyolysis; (4) acute renal failure; (5) left lower

---

[21]Anoxic encephalopathy "is a condition where brain tissue is deprived of
oxygen and there is a global loss of brain function[.]" Encephalopathy,
emedicinehealth, http://www.emedicinehealth.com/encephalopathy/page2_em.htm
(Last accessed March 4, 2014).

[22]The brachial veins are part of an intricate system of veins of the upper
limbs. See Dorland's Illustrated Medical Dictionary, 2032 (32nd Ed. 2012).

extremity compartment syndrome, status post fasciotomy; (6) right lower lobe

pneumonia; (7) gastrointestinal bleed; (8) elevated troponins[23] due to anoxic heart

muscle injury; (9) right radial nerve impairment; (10) deep venous thrombosis in the

right brachial vein; (11) hypoalbuminuria;[24] (12) anemia; (13) polysubstance abuse:

cocaine, marijuana, opiates and tricyclic antidepressants; (14) delirium; (15) anoxic

and metabolic encephalopathy;[25] and (16) impaired glucose tolerance induced,

corticosteroid induced. Id.  The discharge summary states that: Houston's condition

steadily improved during the course of his stay; he was weaned off dialysis; his

renal function significantly improved; he had a normal urine output; his glucose

level returned to normal; the right lower lobe pneumonia healed; the left lower

---

[23]Troponins are proteins found in heart muscle which are involved in the process of contraction. Elevated levels in the blood suggest damage to muscle tissue. See Troponins, Lab Tests Online, http://labtestsonline.org/understanding/analytes /troponin/tab/test (Last accessed March 5, 2014).

[24]Hypoalbuminuria is a medical condition where levels of the protein albumin in the urine are low which is not a harmful condition. In a healthy individual the kidneys prevent proteins from accumulating in the urine. If there were low levels of albumin in the blood (hypoalbuminemia) that would be something to be concerned about. See Albumin, Lab Tests Online, http://labtestsonline.org/understanding/analytes/albumin/tab/test (Last accessed March 4, 2014); Albumin - blood (serum), MedlinePlus, U.S. National Library of Medicine, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/003480.htm (Last accessed March 4, 2014).

[25]Anoxic refers to a lack of oxygen while metabolic encephalopathy "is a broad category that describes abnormalities in the water electrolytes, vitamins, and other chemicals that adversely affect brain function." Encephalopathy, emedicinehealth,http://www.emedicinehealth.com/encephalopathy/page3_em.htm (Last accessed March 5, 2014).

extremity surgical wound had improved; and he was referred to a plastic surgeon for a skin graft. Id.  However, Houston refused a skin graft because he wanted to have a tattoo in the area where the wound was healing, and the plastic surgeon purportedly "signed off the case." Id.  At discharge, Houston was prescribed the blood thinner Coumadin and advised to have periodic blood tests to ensure its effectiveness.  Id. Houston was discharged to home in a stable condition.  Tr. 298. At his initial appointment with Dr. Irena K. Gesheva on March 26, 2007, Houston was in no acute pain or distress, and no significant change in condition was noted. Tr. 291.

However, on March 31, 2007, Houston was again admitted to the hospital because of complaints of left leg pain and confusion. Tr. 249, 251 and 267-269.  CT scans and an MRI revealed that Houston developed a couple of low density areas within the brain, indicating demyelinating changes. Tr. 270-271 and 286-285.  The admission diagnosis was an "[a]ltered mental status with history of severe trauma secondary to rhabdomyolysis, acute renal failure, left lower extremity compartment syndrome status post fasciotomy, history of respiratory failure, pneumonia, GI bleed, elevated troponins likely secondary to anoxic injury, [and] urinary incontinence." Tr. 256.  Houston received treatment at the hospital through May 7, 2007, when he was discharged against medical advice. Tr. 248.

After being discharged from the hospital, Houston was admitted to Park Meadows, a skilled nursing facility. Tr. 451-452. While at Park Meadows Houston received physical therapy. Tr. 461-468.  The results of a physical examination

performed on May 12th were normal. Tr. 450.  Houston had normal muscle tone and

strength. Id.  It was specifically indicated that Houston had a scar on the lower left

extremity but that the wound was healed. Id.  It was also stated that Houston was

oriented to person, place and time; his communication skills were within normal

limits; he responded appropriately to questions; he had a good attention span; and

he had an appropriate affect. Id.  The assessment was status post trauma and he

was advised to continue present medications, diet and physical therapy and to

continue having periodic blood tests to monitor his treatment with the blood

thinner Coumadin. Tr. 449.

Examination notes from Park Meadows dated May 13, 2007, state that

Houston was able to make decisions. Tr. 447. The results of a physical examination

again were normal, including Houston had normal muscle tone and strength. Tr.

448. It was also stated that Houston was oriented to person, place and time; his

communication skills were within normal limits; he responded appropriately to

questions; he had a good attention span; and he had an appropriate affect. Id.

On May 15, 2007, an evaluation of Houston at Park Meadows revealed that

with respect to his musculoskeletal system he had no extrapyramidal

symptoms(EPS)[26], no atrophy and an independent gait. Tr. 451.  Houston's appearance was neat; his motor activity was described as restless; he had normal speech; his attitude was cooperative; his thought processes were intact; he had no hallucinations, delusions, suicidal ideations, or memory problems; he was fully oriented to person, place, time and situation; his affect was constricted; his mood was anxious; and his judgment and insight were impaired. Id.  He was given a tentative diagnosis of "polysubstance dependence/bipolar disorder."  Tr. 452.

By May 21, 2007, Houston's physical therapist at Park Meadows noted that Houston had met his goals and discharged him from therapy. Tr. 462.  She further noted that Houston was "[independent]/safe [with] all mobility." Id.  A Park Meadows's treatment note dated May 22, 2007, reveals that Houston was demanding to be discharged from the facility. Tr. 446.  That note also reveals that Houston was "up ambulating [without (illegible)]." Id.  The assessment was status post trauma, alcohol encephalopathy and pulmonary high blood pressure. Id.  Houston was discharged to home with instructions to follow-up with the clinic or his primary care physician. Id.

---

[26]EP symptoms are abnormal motor activities, including Parkinsonian symptoms, dystonia (sudden contraction and rigidity of muscles) and akathisia (a need for constant movement, e.g., rocky back and forth), associated with dysfunction in a portion of the brain referred to as the extrapyramidal system which controls involuntary reflexes and movement and coordination. See Extrapyramidal system, Chemeurope.com, http://www.chemeurope.com/en/encyclopedia/Extrapyramidal_system.html (Last accessed March 5, 2014).

After the Park Meadow's treatment note of May 22, 2007, we do not

encounter any record of treatment until September 2, 2008. Tr. 224-231. On that

date Houston was examined by Richard Steinfeld, M.D., at the Orthopaedic Center

of Vero Beach, Vero Beach, Florida. Id.  Houston's chief complaint was a fracture of

the right knee cap sustained in a bicycle accident.  Tr. 225. Houston told Dr. Vero

that he had no history of anemia, arthritis, Rheumatoid arthritis,

asthma/emphysema, back disorders, bursitis, bleeding disorders, cancer, diabetes,

heart disease, hepatitis, high blood pressure, aids, kidney infections, kidney stones,

lung disease, lyme disease, paralysis, phlebitis, pneumonia, Rheumatic fever,

stroke, and TB. Tr. 224.  When Dr. Steinfeld reviewed Houston's systems,[27] Houston

denied any diseases of the eyes, nose, throat, sinusitis, loss of hearing, indigestion,

heartburn, hernia, stomach pain, gallbladder disease, bowel disease, intestinal

bleeding, frequent urination, burning with urination, shortness of breath, chill or

fever, heart/chest pain, agina, abnormal heart beat, muscle weakness, joint

pain/stiffness, arm pain on exertion, neck stiffness, muscle aches, arthralgias (joint

pain), back pain, loss of consciousness, numbness, seizures, dizziness, depression,

mania, sleep, disturbance, alcohol abuse, calf cramps when walking, mental

illness/addiction, gout and psoriasis. Tr. 224-225.  Houston told Dr. Steinfeld that he

---

[27]"The review of systems (or symptoms) is a list of questions, arranged by
organ system, designed to uncover dysfunction and disease." A Practical Guide to
Clinical Medicine, University of California, School of Medicine, San Diego,
http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed March 4, 2014).

did not smoke, that he never used alcohol and that he never engaged in the overuse of drugs. Id.

The results of a physical examination performed by Dr. Steinfeld were normal other than with respect to Houston's right knee. Id. An examination of Houston's right knee revealed no deformity, normal alignment, and no torsion, mass, induration, warmth, or redness, but apparent swelling at the knee cap and a palpable knee cap (patellar) gap. Tr. 226. Houston had full strength in the lower legs. Id. The records reflect that Houston ambulated with the assistance of crutches, but had a normal gait and no limp. Tr. 225. The skin of both lower legs was noted to be normal. Tr. 226. Houston had normal reflexes, coordination, and sensation in the extremities. Id. According to Dr. Steinfeld's diagnostic assessment, Houston suffered from a fracture of the right knee cap (patella). Id. Dr. Steinfeld discussed surgical and non-surgical treatment with Houston. Id. Houston ostensibly opted to undergo surgical treatment, but the record is devoid of any evidence of a surgical procedure until September, 2010, almost two years after the date last insured. Tr. 26-27, 227, 231 and 522. Dr. Steinfeld did not provide an assessment of Houston's work-related functional abilities, including his ability to sit, stand, walk, lift and carry.

In January, 2010, Houston sought treatment from Treasure Coast Community Health for right knee pain. Tr. 221. Houston was assessed with a torn ligament and patellar (knee cap) displacement in the right knee. Id. On July 15, 2010, James P. Herberg, M.D., completed a Pennsylvania Department of Public

Welfare Employment Assessment Form on behalf of Houston. Tr. 202-203.  In a conclusory fashion, Dr. Herberg stated that Houston was permanently disabled as a result of a right knee cap injury and atrophy of the right lower leg. Id.  Significantly, Dr. Herberg did not opine that Houston was disabled on or prior to the date last insured nor did he specify when the permanent disability arose.  Additionally, he did not give a detailed assessment of Houston's work-related functional abilities.

Houston also was examined by Daniel Feldman, M.D., in August, 2010. Tr. 469-474.  Dr. Feldman observed that although Houston could not extend his right knee, he could walk with a cane.  Dr. Feldman noted that Houston's left knee cap was unremarkable. Id.  Dr. Feldman did not provide a functional assessment, nor did he opine that Houston was disabled on or prior to the date last insured. Id.

On September 8, 2010, Wade R. Smith, M.D., performed surgery on Houston's right knee to repair the knee cap. Tr. 522-523.  Houston attended a post-surgical follow-up in late September with Dr. Smith. Tr. 497-498.  At that time Houston's suture line was intact, there was no redness or drainage at the surgical site, and Houston's knee was placed in a brace. Id.  Dr. Smith referred Houston to John Findley, M.D., for pain management. Subsequently, Houston revealed to Dr. Findley that he had been an intravenous drug user with opiate dependence for approximately six years. Tr. 503. Dr. Findley proposed converting Houston to methadone. Id.  Neither Dr. Smith nor Dr. Feldman provided a functional assessment and did not opine that Houston was disabled on or prior to the date last insured.

Nancy Cowder, an occupation therapist, evaluated Houston shortly after his knee surgery. Tr. 519. She noted that Houston lived in an apartment with 25-30 steps to enter and that, prior to the operation, he could ambulate independently with a cane. Tr. 520.  X-rays in October 2010 revealed no significant findings. Tr. 509.  By January, 2011, Dr. Smith opined that Houston was doing "very well" with range of motion in the knee from 0-95 degrees; x-rays revealed that Houston's fracture remained fixed in good alignment and was healing; Houston's motor sensory exam was normal and Houston was referred to physical therapy for quadriceps strengthening. Tr. 511-512 and 516.

Finally, there are two assessments in the record regarding Houston's mental condition from state agency psychologists. Tr. 206-219 and 232-245. On September 6, 2007, Michael Zelenka, Ph.D., found that Houston had "some element of depression, history of substance abuse and likely a personality disorder" but there was insufficient evidence to determine that Houston suffered from a mental impairment. Tr. 224.  On March 2, 2010, J. Patrick Peterson, Ph.D., found that Houston did not suffer from a medically determinable mental impairment. Tr. 206.

**DISCUSSION**

The administrative record in this case is 534 pages in length, primarily consisting of medical and vocational records.  The administrative law judge did an adequate job of reviewing Houston's medical history and vocational background in her decision. Tr. 22-30. Furthermore, the brief submitted by the Commissioner

Case 1:12-cv-02148-CCC-GS   Document 16   Filed 03/07/14   Page 26 of 31

sufficiently reviews the medical and vocational evidence in this case. Doc. 14, Brief of Defendant.

Houston argues that the administrative law judge failed to appropriately consider the medical evidence, particularly the records and opinions of the treating physicians.  He also argues that the ALJ mischaracterized the evidence with respect to which knee cap was fractured and inappropriately assessed his credibility.  We have thoroughly reviewed the record in this case and find no merit in Houston's arguments.

The administrative law judge at step one of the sequential evaluation process found that Houston had not engaged in substantial gainful work activity during the period from his alleged onset date of February 14, 2007, through his date last insured of September 30, 2008. Tr. 24.

At step two of the sequential evaluation process, the administrative law judge found that Houston had several severe impairments, including left lower extremity compartment syndrome status post fasciotomy. Tr. 24.  On one occasion, the administrative law judge  incorrectly noted that Houston had a severe left patella fracture, instead of a right patella fracture. Id.  This was simply a decision drafting error.  As evidenced by her questions at hearing, the administrative law judge clearly understood that Houston suffered a right patella fracture. Tr. 60-62. Moreover, the administrative law judge noted that Dr. Herberg completed an employability assessment form in which Dr. Herberg identified Houston's right

patella fracture and lower extremity atrophy as Houston's disabling impairments. Tr. 28.

The administrative law judge specifically determined that Houston suffered from the non-severe impairments of depression, a personality disorder, and a learning disorder. Tr. 25. Obviously, the administrative law judge gave Houston some of the benefit of the doubt based on his testimony, and did not fully accept the opinion of a state agency psychologist that Houston had no medically determinable psychological impairment. Id.  The administrative law judge further noted that although Houston's depression, personality disorder and learning disorder were non-severe, she noted limitations (which we delineate below) in the residual functional capacity assessment. Id.

At step three of the sequential evaluation process the administrative law judge found that Houston's impairments did not individually or in combination meet or equal a listed impairment. Tr. 25.  Houston has not challenged the administrative law judge's step three analysis.

At step four of the sequential evaluation process the administrative law judge found that Houston had the residual functional capacity to perform a limited range of unskilled, light work. Tr. 25-26.  The administrative law judge found that Houston could perform light work that limited him to only the occasional climbing of stairs and ladders, permitted him to change positions every 30 minutes and involved simple, routine tasks. Id.   In setting Houston's residual functional capacity, the administrative law judge relied in part upon the opinions of the state agency

psychological consultants but, as noted above, also gave Houston the benefit of the doubt as to certain of his limitations. Id. The ALJ also rejected the conclusory disability opinion of Dr. Herberg. Tr. 27.

In setting the residual functional capacity, the administrative law judge reviewed the medical records and considered several other items including the treating physicians' medical notes. Tr. 25-28. The administrative law judge found that Houston's statements about his functional limitations were not credible to the extent they were inconsistent with the above residual functional capacity. Tr. 26-27. The ALJ in addressing Houston's credibility stated in part as follows:

> This is a combination, duration and insufficient evidence case during the period at issue, namely February 14, 2007 to September 30, 2008. In terms of the claimant's complaints of pain, the objective evidence fails to support the severity of his symptoms and alleged impairments. . . .

> The undersigned did not find the claimant credible. There were inconsistencies in his testimony. He was not cooperative in responding to questions and would not respond to even his own questions - i.e. when he asked how much weight he could lift, he asked "standing? Or sitting?" When the undersigned then asked him tell me how much he can lift standing and how much he can lift sitting, he stated he did not know. . . .

> A review of the evidence in its entirety does not support the claimant's allegations that he is now illiterate.

> Upon review of the evidence, the undersigned finds that the claimant's testimony with regard to his symptoms, not fully credible, because it was overstated, inconsistent with, and unsupported by, the great weight of the documentary medical evidence.

Tr. 26-27.

No treating physician submitted a functional assessment of Houston which indicated that on or prior to the date last insured he was functionally impaired from a physical or mental standpoint for the requisite continuous 12 month period.[28]

The administrative law judge rejected the disability opinions of Dr. Herberg, a physician who examined and treated Houston's right knee after the date last insured. Dr. Herbert did not indicate that Houston suffered from a disability on or prior to the date last insured. The Court of Appeals for the Third Circuit has set forth the standard for evaluating the opinion of a treating physician in <u>Morales v. Apfel</u>, 225 F.3d 310 (3d Cir. 2000). The Third Circuit stated in relevant part as follows:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." . . . The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.

---

[28]To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

Id. at 317-18 (internal citations omitted). The administrative law judge is required to

evaluate every medical opinion received. 20 C.F.R. § 404.1527(d). In the present

case, the administrative law judge ~~in his decision~~ specifically addressed the opinion

of Dr. Herberg. Tr. 28.

The social security regulations specify that the opinion of a treating physician

may be accorded <u>controlling</u> weight only when it is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p.

Likewise, an administrative law judge is not obliged to accept the testimony of a

claimant if it is not supported by the medical evidence.  An impairment, whether

physical or mental, must be established by "medical evidence consisting of signs,

symptoms, and laboratory findings," and not just by the claimant's subjective

statements.  20 C.F.R. § 404.1508 (2007).  The administrative law judge appropriately

considered objective medical evidence and concluded that the disability opinion of

Dr. Herberg was not adequately supported by the objective medical evidence.

With respect to Houston's argument that the administrative law judge did

not properly consider his credibility, the administrative law judge was not required

to accept Houston's claims regarding his physical or mental limitations. <u>See</u> <u>Van</u>

<u>Horn v. Schweiker</u>, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility

determinations as to a claimant's testimony regarding the claimant's limitations are

for the administrative law judge to make).  It is well-established that "an

[administrative law judge's] findings based on the credibility of the applicant are to

be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." <u>Walters v. Commissioner of Social Sec.</u>, 127 F.3d 525, 531 (6th Cir. 1997); <u>see also</u> <u>Casias v. Secretary of Health & Human Servs.</u>, 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Houston testify, the administrative law judge is the one best suited to assess his credibility.

We are satisfied that the administrative law judge appropriately took into account all of Houston's limitations both physical and mental in the residual functional capacity assessment. Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        March 7, 2014